OPINION OF THE COURT
Lester Evens, J.
In this holdover proceeding, it is undisputed that the building at issue is an interim multiple dwelling (IMD) as defined by the 1982 Loft Law (Multiple Dwelling Law, art 7-C, §§ 280-287). Petitioner asserts, however, that respondent’s space does not qualify for the Loft Law’s protections because it is being used solely for commercial purposes and, alternatively, because it does not constitute respondent’s primary residence.
With the agreement of both sides, the court proceeded to hear solely the issues on the threshold question of whether respondent is entitled to the protections of the Loft Law. It *771 was agreed that if the court found that respondent was not protected, petitioner would then proceed with its prima facie case.
To resolve these issues, the court must determine whether respondent uses his space for residential purposes as a residence or home pursuant to section 281 (subd 1, par [iii]) of the Multiple Dwelling Law and whether a primary residence requirement is authorized by and consistent with the language and intent of the 1982 Loft Law. The primary residence issue will be examined first.
I. PRIMARY RESIDENCE
On May 31, 1983, the Loft Board promulgated a regulation that authorized landlords of registered IMD’s to bring eviction proceedings against residential occupants whose units were not their primary residences. (New York City Loft Board, Rules and Regulations Relating to Determination of Interim Multiple Dwelling Status and Issues of Coverage and Bases for Eviction under Article 7-C of the Multiple Dwelling Law, § J[l][a], The City Record, June 7, 1983 [hereinafter cited as Rules & Regs on Bases for Eviction].) This regulation was purportedly promulgated pursuant to section 1105 of the New York City Charter, section 282 of the Multiple Dwelling Law and the Mayor’s Executive Order No. 66.[1]
All of these authorizations empower the Loft Board to act within the statutory framework set forth by the Legislature, and only within that framework. A careful analysis of the statutory scheme yields no indication, either express or implied, that the Legislature intended or authorized a primary residence requirement for loft dwellers. Nothing *772 in the language or the legislative history of article 7-C specifies or suggests such a limitation on the scope of the statute’s protections. Indeed, the indications are just the opposite.
a. Legislative Intent
In enacting the Loft Law, the Legislature recognized that it was dealing with a unique situation — one encompassing a class of tenants and a class of buildings bearing little resemblance to those protected by existing remedial housing legislation.
During the two years of intensive negotiations and lobbying efforts that preceded passage of the Loft Law, the Legislature had become keenly aware of the realities of loft living and working, particularly with respect to the infinite variety of living/working arrangements maintained by loft tenants and necessitated by their work — arrangements that in most cases differed radically from those of traditional apartment dwellers.
Indeed, the City of New York, in proposing the Loft Law to the Legislature, had explicitly identified the people most in need of protection in its memorandum of support accompanying the final version of the bill: “The bill when enacted will take a ‘snap shot’ of those people eligible for protection under this article. The bill is directed at protecting those loft pioneers of the arts community that have played such an important role in the development of loft areas. This bill recognizes the important impact that those in the creative arts have on the cultural and economic life of New York City and the need for the protection of loft space suitable for their working and living purposes” (McKinney’s Session Laws of NY, 1982, pp 2479, 2484; emphasis added.)
Sensitized to the extreme vulnerability of this class of tenants and to the serious health and safety implications that would persist as long as this group lacked even minimal statutory protections, the Legislature was particularly intent on protecting those occupants of loft dwellings whose work necessitated such dual uses. Thus, the Legislature acted to alleviate the uncertain status of these tenancies as well as the forced relocation, hardship, and disloca *773 tion occasioned by this situation. (See Multiple Dwelling Law, § 280.)
The statutory definition of an IMD reflects this concern with the complexities of joint living/working use of loft space. It brings into focus the reality that people in the arts work long and irregular hours at their studios, including weekends and holidays, and devote large blocks of time to their artistic pursuits, as the nature of their work may require, in many cases necessitating regular separation from their families for days on end.
Subdivision 1 of section 281 of the Multiple Dwelling Law defines an IMD, in pertinent part, as any building or structure or portion thereof that “on December first, nineteen hundred eighty-one was occupied for residential purposes since April first, nineteen hundred eighty as the residence or home of any three or more families living independently of one another.” (Emphasis added.)
The Legislature’s use of “residence or home” in section 281 makes explicit its intent to protect these dual living/working uses and leaves no doubt that it did not contemplate primary residence as a prerequisite for Loft Law protection. Indeed, the “residence or home” distinction unequivocably indicates a much broader and more flexible standard of occupancy for article 7-C coverage (as will be discussed more fully in the second part of this decision).
Article 7-C recognizes the uniqueness of both loft tenants and the buildings in which they live and work with respect to joint residential/commercial use. It provides protections for both landlords and residential occupants alike that are expressly prohibited for traditional residential tenancies and housing accommodations under existing law, protections that reflect their special situation.[2]
Petitioner’s analogies to the primary residence requirement under the Rent Control and Rent Stabilization Laws are inapposite. An analysis of the structural framework of *774 these laws is very instructive in this regard, for it definitively establishes that the Legislature did not intend a primary residence requirement as an implicit condition of article 7-C coverage.
Close examination of the New York City Rent Control Law (Administrative Code of City of New York, § Y51-1.0 et seq.), and the New York City Rent and Eviction Regulations (hereinafter cited as Rent Regs), the Rent Stabilization Law (Administrative Code, § YY51-1.0 et seq.), and the Code of the Real Estate Industry Stabilization Association of New York City, Inc. (hereinafter cited as RSC), and the Emergency Tenant Protection Act of 1974 (ETPA; L 1974, ch 576, § 4) reveals a consistent statutory scheme in the sense that each of these statutes and accompanying implementing regulations consists of two basic substantive elements, one relating to coverage under the statute and the other dealing with rent regulation and evictions.
Each of these three remedial housing statutes includes an explicit reference to primary residence in its coverage portion.[3] The regulations that implement these statutes refine this theme, detailing how a landlord must proceed when a unit ceases to be eligible for coverage because of a change in the tenant’s primary residence.[4]
Salient here is that in all three statutes the Legislature placed the primary residence provisions within the coverage context, not within the eviction context. The regulations implementing these statutes reflect this focus, dealing with primary residence as a basis for removing a previously controlled unit from coverage during such time as the reason for its protected status no longer exists.[5]
Article 7-C reflects the same conceptual scheme noted above, containing coverage and rent regulation/eviction *775 components. The Legislature designated the Loft Law as the exclusive source of coverage requirements for loft dwellers, explicitly setting forth the criteria necessary to qualify for article 7-C’s protections. The statute’s various provisions are totally devoid of any indication that the Legislature intended primary residence as a prerequisite for coverage or that lack of primary residence would serve as a trigger for removing a unit from coverage, much less as a ground for eviction.
Indeed, even after an IMD has attained code compliance, the ETPA’s primary residence provisions will not apply to loft tenants protected by article 7-C. Subdivision 3 of section 286 of the Multiple Dwelling Law specifically provides that once compliance is achieved and the Loft Board has set the initial legal regulated rent, each residential occupant must be offered a residential lease subject to the provisions regarding evictions and regulation of rent set forth in the ETPA, except to the extent the provisions of article 7-C are inconsistent' with the ETPA.
Hence, even after compliance, only those provisions of the ETPA dealing with evictions and rent regulation will apply to leases offered to residential occupants, not the ETPA’s coverage requirements, and where the ETPA’s eviction and rent regulation provisions conflict with the requirements of article 7-C, the Loft Law’s provisions will prevail. Simply put, after compliance, the eviction/rent regulation portion of the ETPA will apply to loft tenancies, but coverage criteria will continue to be governed by article 7-C. Thus, the ETPA’s primary residence exclusion from coverage does not apply to residential occupants protected by the Loft Law now or in the future.
Article 7-C singled out for protection a special class of buildings and occupants. Any interpretation that seeks to read a primary residence requirement into the statute would not only completely undermine the Legislature’s intent to protect this special class but would also fly in the face of the Legislature’s consistent and rational treatment of primary residence in the Rent Control and Rent Stabilization Laws as a coverage issue.
Given this framework, it is inconceivable that the Legislature implicitly intended a primary residence require *776 ment in order for otherwise qualified residential occupants to secure the Loft Law’s protections. Had the Legislature wanted to build in such a coverage requirement for loft tenants, it certainly would have specified that limitation, as it has done with respect to residential tenancies in other remedial housing legislation. The conclusion is inescapable here that the Legislature, recognizing the uniqueness of the living/working arrangements of loft tenants, chose not to add such a provision to article 7-C.
b. Statutory Authority
Under established principles of law, the Loft Board’s regulation positing lack of primary residence as a basis for eviction is unenforceable, for it exceeds the authority granted to it by the Legislature in article 7-C. Even if the court had found merit to petitioner’s contention that a primary residence requirement can be inferred as a condition of Loft Law coverage, the regulation would still be a nullity as an unlawful delegation of authority by the Legislature.
It is well settled that only a legislative body may declare legislative policy. Although a law-making body may confer a measure of discretion on an administrative agency or board, it must simultaneously define the limits of that discretion and fix the rules or standards that will govern the agency’s exercise of that discretion. (Matter of Small v Moss, 279 NY 288, 295.)
The Legislature, however, may not delegate to an administrative body the power to decide whether higher standards or additional requirements are necessary for the protection of the public good. This is so even where such higher standards or additional requirements might reasonably be necessary and even where the Legislature has neglected to specify them. (Matter of Lyons v Prince, 281 NY 557, 564-565.)
An administrative body such as the Loft Board has no power to declare legislative policy or to create the standards or additional requirements that will govern the bases for eviction. The Loft Board may only apply the policy declared by the Loft Law and the rules and standards laid down in that statute. (See Matter of Small v *777 Moss, 279 NY, at p 297; cf. Broidrick v Lindsay, 39 NY2d 641, 645-646 [regulations promulgated by executive branch].)
These principles are expressly reflected in subdivisions (a) and (d) of section 282 of the Multiple Dwelling Law and Executive Order No. 66, each of which is carefully framed to limit the Loft Board’s functions to those prescribed by and consistent with article 7-C. (See n 1, supra.) Moreover, the rule-making authority conferred on agency heads by the New York City Charter is limited to administrative acts. (Acorn Employment Serv. v Moss, 292 NY 147, 153.)
Although section 282 of the Multiple Dwelling Law authorized the establishment of the Loft Board in order to resolve complaints of owners and residential occupants of qualified IMD’s and set forth as two of its duties the determination of IMD status and other issues of coverage and the issuance and enforcement of rules and regulations pursuant to article 7-C, this statutory language can in no way be rationalized as granting the Loft Board the power to determine bases for eviction of otherwise qualified residential occupants of IMD’s — bases not authorized by the Loft Law — as parts of section J(l) of Rules & Regs on Bases for Eviction purport to do. The Legislature certainly did not delegate this authority to the Loft Board, for such an act would constitute an improper delegation of power by the Legislature.
As noted above, the Legislature has chosen not to adopt a primary residence requirement for residential occupants of lofts. It has not conferred, and indeed could not confer, either by express language or by fair implication, the power to adopt such a requirement upon the Loft Board.
This new requirement does not serve to clarify or interpret the statutory language of article 7-C or to fill in any logical gaps in the statute in order to carry out the Legislature’s policies in an orderly fashion. This new regulation constitutes legislating, pure and simple, and this the Loft Board cannot do. Only the Legislature can add higher standards or additional requirements, not the Loft Board.
As the Court of Appeals stated many years ago in an analogous context, “This court has repeatedly pointed out that the courts may not invade the field of discretion *778 conferred by law upon an administrative officer. It has also pointed out that such field of discretion must be defined by the Legislature. The Legislature must set bounds to the field, and must formulate the standards which shall govern the exercise of discretion within the field. Without the second rule as a corollary to the first rule there would be no effective restraint upon unfair discrimination or other arbitrary action by the administrative officer.” (Matter of Small v Moss, 279 NY, at pp 298-299.)
The adoption of a primary residence requirement by the" Loft Board is thus in derogation of article 7-C. It is neither authorized by nor consistent with the language or intent of the Loft Law and is therefore a nullity.
This is not to say, however, that primary residence considerations are never appropriate or relevant. It would be within the scope of the Loft Board’s authority, for example, to suggest that one of the elements in determining solely commercial use versus residential use is whether a loft space constitutes a person’s primary residence. The Loft Board’s promulgation of a hard-and-fast rule authorizing eviction of a residential occupant who is found not to occupy a loft space as a primary residence, however, goes way beyond its legitimate power to implement the provisions of article 7-C. This constitutes an ultra vires act, and section J(l)(a) of the regulation is therefore unenforceable.
II. RESIDENTIAL USE
As noted above, the use of “residence or home” in section 281 (subd 1, par [iii]) of the Multiple Dwelling Law makes clear the Legislature’s intent that loft dwellers qualify for article 7-C protection if they occupy their space as either a residence or a home.
It has long been recognized that where a statute contains a combination of terms that, if used alone, might arguably be synonymous, those terms should be treated as mutually exclusive, rather than as synonyms. Any other interpretation would introduce surplusage into the statutory scheme and would ignore the distinctions among the individual terms.
For example, in Kemp v Kemp (172 Misc 738, 744) where a statute used the combination “residing or domiciled,” not *779 merely one of those terms, the court held that in framing the statute, “the Legislature was careful to resolve any possible doubt by using the combination of words ‘residing or domiciled,’ not as synonyms — for that would be mere redundancy — but as mutually exclusive and as expressing the well-settled distinction between ‘residence’ and ‘domicile’ defined in Matter of Newcomb [192 NY 238].”
This basic tenet of statutory construction applies here in interpreting the legislative intent behind section 281 (subd 1, par [iii]). By specifying “residence or home”, the Legislature expressly differentiated between the two types of occupancy, thus providing for article 7-C protection if a tenant met the less stringent residence standard but did not use the dwelling as a home. It is inconceivable, even to a jaundiced eye, that the Legislature was unaware of the differences between the two terms and of the specific impact of each on loft dwellers, especially given the long and intensive negotiations and the many resulting compromises that preceded passage of the statute.
Home and residence are not synonymous. Black’s Law Dictionary (5th ed, p 660) defines home as “the house in which one lives; especially the house in which one lives with his family; the habitual abode of one’s family * * * That place in which one in fact resides with the intention of residence, or in which he has so resided, and with regard to which he retains residence or to which he intends to return * * * [and] Place where a person dwells and which is the center of his domestic, social and civil life.”
The definition of residence does not include living together with one’s family as one of its elements nor any intent to return. Rather, residence is defined as “[p]ersonal presence at some place of abode with no present intention of definite and early removal and with purpose to remain for an undetermined period, not infrequently, but not necessarily combined with design to stay permanently.” (Id., p 1176; emphasis added.)
Home is akin to domicile, which is distinct from residence. Indeed, the word “domicile” is derived from the Latin “domus”, meaning a home or dwelling house. (17 NY Jur, Domicile and Residence, § 2, p 5.) Domicile has been *780 characterized as “the place a person calls home, however many residences he may maintain.” (Siegel, NY Prac, § 118, p 148.)
Domicile refers to a place of permanent residence, as distinguished from a temporary and indefinite, though actual, place of residence; legal residence, as distinguished from a temporary place of abode; home, as distinguished from a place to which business or pleasure may temporarily call. (Black’s Law Dictionary [5th ed], p 435; 17 NY Jur, Domicile and Residence, § 2, p 5.)
As the Court of Appeals made clear some 75 years ago, “As domicile and residence are usually in the same place, they are frequently used, even in our statutes, as if they had the same meaning, but they are not identical terms, for a person may have two places of residence, as in the city and country, but only one domicile. Residence means living in a particular locality, but domicile means living in that locality with intent to make it a fixed and permanent home. Residence simply requires bodily presence as an inhabitant in a given place, while domicile requires bodily presence in that place and also an intention to make it one’s domicile.” (Matter of Newcomb, 192 NY 238, 250.)
Thus, home and domicile encompass a degree of permanency that is lacking in the concept of residence. Intent is a critical element for both — home being the habitual abode of one’s family to which one intends to return and domicile referring to bodily presence in a place coupled with intent to make that place one’s fixed and permanent home.
Residence requires bodily presence as an inhabitant in a place — i.e., something more stable than mere physical presence but less enduring than domicile. Accordingly, an occasional stopover at a hotel or rooming house or a vacation stay at a resort is not sufficient to establish a residence, nor are occasional overnight visits to a business premises, even where these premises are rented on a year-round basis, but a permanent or recurrent hotel residence or a habitual summer residence does qualify as a residence. (See Rawstorne v Maguire, 265 NY 204; Hammerman v Louis Watch Co., 7 AD2d 817, 818; Fromkin v Loehmann’s Hewlett, 16 Misc 2d 117, 118.)
*781 The fact that a person occupies a dwelling for the time being, either for a block of time or intermittently but on a regular basis, is thus enough to make that place a residence. The amount of time a person spends at one or the other place is not decisive in determining whether that place is the person’s residence or home/domicile. Intent to return and remain is the crucial distinction between the two concepts. (See 17 NY Jur, Domicile and Residence, §§ 17, 27-29.)
Section 281 (subd 1 par [iii]) of the Multiple Dwelling Law appears to use “home” as synonymous with “domicile,” with “residence” implying a less definite and less intentional form of occupancy than the other two categories. This is consonant with the Legislature’s intent to protect this particularly vulnerable class of tenants and its sensitivity to the unique and innovative types of living/working arrangements that their artistic endeavors entail. Any attempt to limit the Loft Law’s coverage to those residential occupants who maintain a household in their loft space for their family, as petitioner argues, would defeat the Legislature’s intent to protect the occupants of these dual-use spaces.[6] By indicating either residence or home in section 281 (subd 1, par [iii]), the Legislature removed any ambiguity on this point.
At a hearing to determine the nature of respondent’s use of the premises during the requisite statutory period (April 1, 1980 to Dec. 1, 1981), various witnesses described his joint residential/commercial use of the space, whereas others testified merely to a lack of any knowledge of residential use by respondent.
Based on the credible testimony proffered at the hearing, the court makes the following findings of fact.
Respondent Dixon, a fashion photographer, took occupancy of the third floor of 29 East 19th Street in December, *782 1972. He divided the space into two distinct studios, each with its own locked entrance from a common hallway. He made a number of improvements. His portion contained a bathroom, with the usual appliances, including a shower. He installed complete kitchen facilities, with sink, stove, refrigerator, and cabinets. The kitchen was completely stocked with all the necessary utensils and equipment for cooking and eating. Provision was made for eating facilities for one or more persons.
Frank Marsi lived and worked in the other portion of the space during 1980 and 1981, having vacated the space sometime in 1982. In another action decided on November 6, 1980, involving different respondents in the subject building, Dixon and Marsi were each found to have occur pied separate portions of the third floor and to have lived and worked there with the knowledge of the landlord.[7]
Dixon often sleeps at his loft when he is working there. The nature of his work requires him to work irregular hours, frequently at night. He spends an average of four days a week at his loft and sleeps there about half of that time. He sleeps on a couch in his studio. He has entertained people in his loft for dinner on occasion but admittedly cooks very little for himself and frequently eats out.
When he is out of town on assignment, Dixon, of course, sleeps on location, averaging approximately 125 nights a year out of town (which includes Saturdays and-Sundays). Some of these assignments require several weeks to complete, during which time he works a full seven-day week.
When he is not working in his studio or out on assignment, Dixon spends his time with his family in Ossining, New York, which averages one or two days a week. He and his wife own their Ossining home, and he is registered to vote and has a driver’s license from that address.
Dixon posited the figures above as rough estimates, since the precise number of days he spends at his studio, on location, and in Ossining varies each year, depending upon his workload. Using the down side of Dixon’s estimates, the court finds that during 1980 and 1981 he spent an average *783 of two nights a week at his loft, two nights a week with his family in Ossining, and the balance of three nights a week on location on work assignments. Thus, he spends roughly 28.5%-of his time at his loft, 28.5% with his family in Ossining, and 43% out of town on location. Based on these estimates, Dixon works approximately 60% on location and 40% at his loft.[8]
The court takes judicial notice that the trip from New York to Ossining takes over an hour, no matter what method of transportation is used. In addition, public transportation does not run late at night.
Based on these facts and the established legal principles set forth above, the court finds that during the statutory period April 1, 1980, to December 1, 1981, Dixon occupied his loft space for residential purposes as joint living/working space. During that time, Dixon maintained a house in Ossining, which served as his home and place of domicile, and a living/working space at 29 East 19th Street, which served as his residence.
The nature of Dixon’s work, including his work hours, necessitates his having a residence at his studio. His irregular working hours and the fact that his home is a substantial distance away makes it extremely difficult for him to travel to his home every evening, especially the many evenings he works late into the night. •
Dixon’s use of his loft space falls well within the statutory language and intent of section 281 (subd 1, par [iii]) of the Multiple Dwelling Law and is consonant with the well-settled definitions of residence, home, and domicile enumerated above. He belongs to precisely that class of tenants that article 7-C was designated to protect. Consequently, based on the law and the facts in this case, respondent is a residential occupant of the subject premises and qualifies for the Loft Law’s protections. The petition is accordingly dismissed.

. Subdivision a of section 1105 of the New York City Charter authorizes the head of an agency to “make rules and regulations for the conduct of his office or agency and to carry out its powers and duties.”
Subdivisions (a) and (d) of section 282 of the Multiple Dwelling Law give the Loft Board the power and the duty, among other things, to make determinations of IMD status and other issues of coverage and to issue and enforce rules and regulations pursuant to article 7-C.
Section 2 of Executive Order No. 66, issued by the Mayor of the City of New York on September 30, 1982, established the Loft Board “to carry out those duties and perform those functions with respect to the legalization and conversion of non-residential buildings for residential use as are prescribed by Article 7-C” and authorized it to “exercise those powers and perform those acts consistent with the terms and intent of Article 7-C as may be reasonable and necessary to carry out the provisions of the law.” (Emphasis added.)

. For example, article 7-C of the Multiple Dwelling Law authorizes landlords of IMD’s to recover rent and to maintain an action or proceeding for possession for nonpayment of rent despite the absence of a certificate of occupancy and the failure to register the dwelling. (Multiple Dwelling Law, § 285, subd 1.) It also permits residential tenants to sell their fixtures. (Multiple Dwelling Law, § 286, subd 6.) It entitles qualified tenants to the eviction and rent regulation protections of the Emergency Tenant Protection Act of 1974 (L 1974, ch 576, § 4) after compliance even though there are less than six residential tenants. (Multiple Dwelling Law, § 286, subd 3.)

. Rent Control Law, Administrative Code, § Y51-3.0, subd e, par 2, cl (i), subcl (10), as amd by L 1983, ch 403, § 42; Rent Stabilization Law, Administrative Code, § YY513.0, subd a, par (1), cl (f), as amd by L 1983, ch 403, § 41; ETPA, § 5, subd a, par (11).

. Rent Regs, § 18; RSC, § 54, subd E.

. The “Scope” portion of the Rent Regs, rather than its “Evictions” sections, ' contains a provision, section 18, outlining the procedure for decontrolling a previously rent-controlled hoivlng accommodation found to be no longer occupied as the tenant’s primary residence. Section 54 of the RSC, which specifies the grounds upon which a landlord may refuse to renew a lease, as opposed to section 53 of the RSC, which pinpoints grounds for eviction, also provides a procedure, subdivision E of section 54, for removing from coverage (after expiration of a tenant’s lease) a unit that is found to be no longer occupied as the tenant’s primary residence.

. Petitioner’s focus on “family” as the critical element in section 281 (subd 1, par [iii]) of the Multiple Dwelling Law for determining residential use is misplaced. A thorough examination of the Loft Law reveals that the term “family” is used only once in article 7-C, with reference to and descriptive of the minimum number of units required for coverage in section 281 (subd 1, par [iii]) of the Multiple Dwelling Law. All other references to usage throughout the statute specify residential occupants or tenants. The emphasis in the definition is on the existence of at least three distinct residential units that are independent of each other. The word “family” cannot be taken out of its proper context in the statute — “three or more families living independently of one another.”

. Axelrod Co. v Duffin, Civ Ct of City of NY, NY County, index No. L&T 63105/80, final judgment entered Dec. 30,1980, revd on other grounds NYLJ, Sept. 3,1982, p 6, col 1 (App Term, 1st Dept).

. Although Dixon guessed at a 70/30 per cent division of his work time, the evidence established a 60/40 ratio.